Clarence ERVIN, Addrienne Ervin, Dewayne Wells and Maxine Wells, Plaintiffs-Appellants,

v.

CITY OF KENOSHA, Defendant-Respondent.

Supreme Court

*No. 89-0909. Argued October 30, 1990.—Decided January 23, 1991.*

(On certification from the court of appeals.)

(Also reported in 464 N.W.2d 654.)

464

466

BABLITCH, J., dissents.

For the plaintiffs-appellants there were briefs (in the court of appeals) by *Adrian P. Schoone, Mark J. Leuck* and *Schoone, Ware & Fortune, S.C.,* Racine and oral argument by *Mr. Leuck.*

For the defendant-respondent there was a brief (in the court of appeals) by *Robert I. Dumez,* and *O'Connor*

*& Willems, S.C.,* Kenosha and oral argument by *Mr. Dumez.*

Amicus Curiae was filed by *James Schneider,* Madison, for the League of Wisconsin Municipalities.

Amicus Curiae was filed by *Thomas Armstrong* and *Quarles & Brady,* Milwaukee, for Cities and Villages Mutual Insurance Company and Wisconsin Parks & Recreation Association.

CALLOW, WILLIAM G., J.   This case is before this court on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats. The parents[1] appeal from a summary judgment (dismissing their complaint) of the circuit court for Kenosha county, Judge David M. Bastian. The parents raise three issues on appeal. First, they contend that sec. 895.52(2), Stats.[2] (Wisconsin's recreational use statute), does not immunize the city of Kenosha (City) from liability for negligently hiring and

---

[1]The plaintiffs-appellants in this case are the parents of two youths who drowned at Pennoyer Beach, a public beach owned and operated by the city of Kenosha. For ease of reference, they will be referred to as the parents.

[2]Section 895.52(2), Stats., provides:

NO DUTY; IMMUNITY FROM LIABILITY.   (a) Except as provided in subs. (3) to (6), no owner and no officer, employe or agent of an owner owes to any person who enters the owner's property to engage in a recreational activity:

1.  A duty to keep the property safe for recreational activities.

2.  A duty to inspect the property, except as provided under s. 23.115(2).

3.  A duty to give warning of an unsafe condition, use or activity on the property.

(b) Except as provided in subs. (3) to (6), no owner and no officer, employe or agent of an owner is liable for any injury to, or any injury caused by, a person engaging in a recreational activity on the owner's property or for any injury resulting from an attack by a wild animal.

failing to properly train and instruct lifeguards for its public beach, nor is the City immune from liability for the negligent performance of these lifeguards. Second, the parents contend that summary judgment was inappropriate in this case because genuine issues of material fact existed which should have been tried to a jury. Third, the parents argue that, even if the City's conduct would otherwise be immunized by sec. 895.52(2), the City is liable under sec. 895.52(4)[3] because its conduct was malicious.

We first conclude that the City is immune from liability under sec. 895.52(2), Stats. It is not liable for its negligence in hiring or failing to properly train the lifeguards, or for the lifeguards' negligent performance. We next conclude that no genuine issues of material fact exist and summary judgment was proper as a matter of law. Finally, we conclude that the City's conduct was not malicious and therefore the City is not liable under sec. 895.52(4)(b).

The relevant facts follow: Two minors, Clarence Ervin III and Brian Wells, drowned on July 8, 1987, at a beach owned and operated by the City. The youths were in chest-high water at the south end of the beach near an

---

[3]Section 895.52(4), Stats., provides:

LIABILITY; PROPERTY OF GOVERNMENTAL BODIES OTHER THAN THIS STATE. Subsection (2) does not limit the liability of a governmental body other than this state or any of its agencies or of an officer, employe or agent of such a governmental body for either of the following:

(a) An injury that occurs on property of which a governmental body is the owner at any event for which the owner charges an admission fee for spectators.

(b) Any injury caused by a malicious act or by a malicious failure to warn against an unsafe condition of which an officer, employe or agent of a governmental body knew, which occurs on property designated by the governmental body for recreational activities.

unmarked, steep eight-foot drop-off. The drop-off was approximately ten to fifteen feet from the shore. The youths encountered the drop-off and went underwater. Unable to swim, the youths submerged and reemerged for several minutes. Several bystanders entered the water in an attempt to rescue the youths, after they saw the youths go underwater without reemerging.

At the time of this incident, the beach was staffed by four lifeguards employed and trained by the City. A female lifeguard was at the lifeguard station nearest the area of the drownings. Two hundred yards north of her station was a second lifeguard station that may have been unattended because the lifeguard assigned to that station was allegedly away from his station. The head lifeguard was at a third station on the north end of the beach, one hundred yards north of the allegedly unattended station. An off-duty lifeguard was on an authorized thirty-minute break.

The female lifeguard saw the two youths at the drop-off, but did not warn them of the danger, and there was no City policy requiring her to do so. Sometime after the youths went underwater she blew her whistle and the head lifeguard responded, reaching the area in approximately one minute. After two more minutes, he recovered Brian Wells and initiated cardiopulmonary resuscitation (CPR). He simultaneously gave CPR instructions to the off-duty lifeguard who had recovered Clarence Ervin III. Both youths were then taken to the hospital and later pronounced dead.

Several bystanders testified at a deposition that before they finally went underwater, the two youths had struggled in the water for approximately three to five minutes. The bystanders also testified they had gone into the water to try to rescue the youths before any lifeguard entered the water. According to one of these

470

bystanders, the youths were underwater five minutes before they were discovered. She also stated that the female lifeguard had seen the youths struggling. Another bystander testified that the female lifeguard appeared to be panicked and confused during the rescue efforts.

The City hired the lifeguards without formal interviews or skills testing. Moreover, the City had not provided them any lifeguard, first-aid or rescue training prior to this incident. With the exception of the head lifeguard, none of the lifeguards had been previously involved in rescue or first-aid efforts. After the drownings, the City posted a warning sign at the drop-off, equipped the lifeguards with radios, and ordered CPR training for the lifeguards.

The parents sued the City alleging, among other things, that the City was negligent in maintaining a hazardous condition and failing to warn of this condition, and in failing to properly train and instruct its lifeguards. The parents also alleged that the lifeguards were negligent in performing their duties and that the City was vicariously liable for this negligence. The circuit court granted the City's motion for summary judgment on the ground that the City was immune from liability under sec. 895.52, Stats., as a matter of law.

The case is presently before this court on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats., and this court will consider all three issues raised on appeal.[4]

---

[4]In their appeal, the parents raise four issues, two of which involve the City's potential liability under sec. 895.52, Stats. The parents argue that the City is not immune for two reasons: (1) sec. 895.52 does not immunize the City from vicarious liability for the lifeguards' conduct, and (2) sec. 895.52 does not immunize the City for its negligent hiring and failure to train these lifeguards. Because we hold that the City is immune from liability under

## I.

The parents argue that sec. 895.52(2), Stats., does not immunize the City from liability for the lifeguards' negligence or for its own negligent hiring and failure to train them. The parents contend that the City's conduct represented "active" negligence, and that the statute was intended to immunize only "passive" or "condition of the premises" negligence. We disagree because: (a) the plain language of the statute does not support this contention, (b) Wisconsin case law permits immunity under the recreational use statute for both active and passive negligence, and (c) legislative intent clearly supports granting immunity for both active and passive negligence.

"The construction of a statute in relation to a given set of facts is a question of law." *Tahtinen v. MSI Ins. Co.,* 122 Wis. 2d 158, 166, 361 N.W.2d 673 (1985). We decide questions of law without deference to the circuit court's determination. *Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). The test for determining whether a statute is ambiguous is whether the statute is capable of being understood by reasonably well-informed persons in two or more different senses. *Wirth v. Ehly,* 93 Wis. 2d 433, 441, 287 N.W.2d 140 (1980).

We conclude that the statute is clear on its face and capable of being understood only in one way: the City is immune from liability under sec. 895.52(2), Stats., unless one of the exceptions in secs. 895.52(3)–(6) apply. Subsection (2)(a) clearly indicates that neither the City nor

---

either circumstance, we consolidate these issues for purposes of this decision.

the lifeguards had a duty to keep the beach safe for recreational activities, or to warn of any unsafe condition. The City is an "owner" as defined in sec. 895.52(1)(d),[5] and the lifeguards were employees of the City. Additionally, under subsection (2)(b), neither the City nor its lifeguards were liable for· any injury to a person engaging in a recreational activity on the City's property. The youths were engaged in a recreational activity[6] at the time of the accident. Applying the language of the statute, the City is immune from liability.

"If the meaning of the statute is clear and unambiguous on its face, then resort to extrinsic aids for the purpose of statutory construction is improper." *State v. Derenne,* 102 Wis. 2d 38, 45, 306 N.W.2d 12 (1981). Notwithstanding the clear language of the statute, the parents argue that the City is nonetheless liable because sec. 895.52, Stats., only immunizes "passive" (condition of the land) negligence, not "active" negligence. The parents contend that the statute should be narrowly construed to apply only to passive negligence because the statute is in derogation of common law. *See LePoidevin v. Wilson,* 111 Wis. 2d 116, 129, 330 N.W.2d 555 (1983) ("[S]tatutes in derogation of the common law must be strictly construed."). The parents also contend that the City was actively negligent because: (a) it improperly hired, trained and instructed the lifeguards, and (b) the

---

[5]Section 895.52(1)(d), Stats, provides, in part:

(d)   "Owner" means either of the following:
    1.   A person, including a governmental body or nonprofit organization, that owns, leases or occupies property.

[6]Section 895.52(1)(g), Stats., provides, in part:

"Recreational activity" means any outdoor activity undertaken for the purpose of exercise, relaxation or pleasure, including practice or instruction in any such activity. "Recreational activity" includes, but is not limited to, . . . water sports . . ..

lifeguards performed negligently during the drownings. The parents rely primarily on *LePoidevin*. *LePoidevin* involved sec. 29.68, Stats. 1975, the predecessor statute to sec. 895.52.

In *LePoidevin,* we drew a distinction between "active" negligence and "condition of the premises." *LePoidevin,* 111 Wis. 2d at 122. We held that the landowner in *LePoidevin* was not immune from liability. *Id.* at 132. However, *LePoidevin* involved a case where a landowner had invited a social guest onto his property for recreational purposes. *Id.* at 121. We stated,

> [the defendant] has not opened his land to the "public" generally nor has he given permission to one or more members of the "public" to use the land for recreational purposes. He opened his land to a social guest who was invited onto the land. Granting the protection afforded by sec. 29.68 to a landowner who invites a friend of the family to the summer cottage as a guest to join the family in water sports does not foster the purpose of sec. 29.68 to encourage landowners to make land and water areas available to the public for recreational use.

*Id.* at 131–32. Our situation is distinct in that the youths were not "social guests," and, as will be discussed later, the legislature intended to protect landowners such as the City from liability under sec. 895.52, Stats., when it was enacted and sec. 29.68, Stats., repealed.

We also addressed this distinction between active and passive negligence in *Wirth,* 93 Wis. 2d at 446. In *Wirth,* we clarified that this distinction did not apply to permitted entrants on land for recreational use. We granted the landowner and its agents immunity under sec. 29.68, Stats., when we stated:

474

> [t]he statute does not contemplate that the land sub-
> ject to public recreational use shall remain static.
> Since the purpose of the statute was to open land for
> recreational use, it would be inconsistent for the stat-
> ute to provide protection only if the owner or occu-
> pant does not perform any potentially negligent
> activities on the land.

*Id.* Our case, like *Wirth,* involved permitted entrants on
land for recreational activities, not invited social guests
as in *LePoidevin.*[7]

██

We stated in *LePoidevin,* "where there exists a com-
mon law doctrine relevant to the issue presented by the
parties and the statute would change the common law,
the legislative intent to change the common law must be
clearly expressed." *LePoidevin,* 111 Wis. 2d at 129–30.
We further stated, "[b]ecause sec. 29.68 is contrary to
the common law and the general public policy of the
state that a person should be liable for negligently
inflicting injury, the statute should be construed strictly
to accomplish its legislative purpose." *Id.* at 130. Section
29.68, Stats., was repealed in 1983 by 1983 Wis. Act 418,
the same Act which created sec. 895.52, Stats. The legis-
lature stated,

> [t]he legislature intends by this act to limit the liabil-
> ity of property owners toward others who use their
> property for recreational activities under circum-
> stances in which the owner does not derive more

---

[7]While we recognized in *LePoidevin* that "it is difficult to
draw a bright line between a landowner who grants permission to
persons to use the premises for recreational purposes and is pro-
tected by sec. 29.68 and a landowner who invites a person to use
the premises for recreational purposes and is not protected by sec.
29.68," *LePoidevin,* 111 Wis. 2d at 132, our situation does not
involve an invited social guest.

than a minimal pecuniary benefit . . .. [T]his legislation should be liberally construed in favor of property owners to protect them from liability. The act is intended to overrule any previous Wisconsin supreme court decisions interpreting section 29.68 of the statutes if the decision is more restrictive than or inconsistent with the provisions of this act.

1983 Wis. Act 418, sec. 1. It is clear from this language that sec. 895.52 was to be interpreted liberally in favor of property owners such as the City. Because *LePoidevin* was decided before the enactment of sec. 895.52, and its application to this case is inconsistent with the provisions of 1983 Wis. Act 418, the parents' reliance on its active/passive negligence distinction is misplaced.

Finally, the parents argue that, regardless of whether an active/passive negligence distinction exists, the City assumed a duty to provide lifeguard services in a non-negligent manner when it provided lifeguards initially, and is therefore liable. *See American Mut. Liab. Ins. Co. v. St. Paul Fire & Marine Ins. Co.,* 48 Wis. 2d 305, 313, 179 N.W.2d 864 (1970). Section 895.52(2)(b), Stats., specifically relieves the City from liability for any injury to a person engaging in a recreational activity, in conflict with *American Mutual*'s common law principle of liability for gratuitous actions. While this argument is facially different from the parents' argument for an active/passive distinction, in substance the same principles apply.

The legislature clearly expressed an intent to change conflicting common law when it enacted 1983 Wis. Act 418. *See LePoidevin,* 111 Wis. 2d at 130 ("[T]he legislative intent to change the common law must be clearly expressed."). The clear legislative intent was to construe sec. 895.52, Stats., in favor of landowners to protect

476

them from liability. 1983 Wis. Act 418, sec. 1. For this reason, the principle enunciated in *American Mutual* cannot be used to narrow the scope of immunity under sec. 895.52. Rather, this statute acts to protect the City from liability even though it gratuitously provided lifeguards.

We recognize that such a holding has negative consequences for unfortunate victims in cases such as this. However, the legislature has not provided recourse for the victims' parents under the recreational use statute.

The intent of sec. 895.52, Stats., was to encourage landowners to open up their land for recreational activity. If liability were imposed on landowners for negligence in failing to provide adequate safety measures, it would encourage landowners to provide no safety measures. The City, in order to avoid liability, would elect not to provide lifeguards or not to open the beach at all. Also, the building, maintenance and staffing of playgrounds, campgrounds, piers, playing fields, and fences all require affirmative action on the part of landowners. If liability were imposed based on a theory of "active negligence" or "gratuitous acts," these facilities may not be provided. Such a result would conflict with the intent of sec. 895.52.

As under sec. 29.68, Stats.,[8] sec. 895.52, Stats., shifts some of the risk of injury from the landowner to the entrant. Section 895.52 was not enacted to provide indiscriminate immunity for landowners without regard to possible consequences. Rather, it is the result of a balancing of policy considerations and a conscious decision by the legislature that the advantages to the public of opening land for recreational use outweigh the possibility of injury to the entrants. *See LePoidevin,* 111 Wis.

---

[8]*LePoidevin,* 111 Wis. 2d at 129.

2d at 129 (discussing this balancing of policies under sec. 29.68). While we recognize that there may be good public policy reasons for finding liability in this case, when a legislative mandate is "clearly expressed and there is no warrant for alternative construction, a court may not impose its view of what the law should be." *Wirth,* 93 Wis. 2d at 448 (quoting *Magro v. City of Vineland,* 148 N.J. Super. 34, 39, 371 A.2d 815 (1977)). Here the legislature has balanced competing policy interests and set forth its intent in the statute, and we will not disturb that decision. We stated in *Wirth,* "[t]he determination of broad principles or policies for social conduct is the chief characteristic of the legislative function. When the function is exercised by a legislature, the principles are set forth in statutes." *Wirth,* 93 Wis. 2d at 448 (quoting Sands, 1 *Sutherland Statutory Construction,* sec. 1.03 (4th ed. 1972)).

## II.

Summary judgment is proper when there is no genuine issue as to any material fact. *Heck & Paetow Claim Service, Inc. v. Heck,* 93 Wis. 2d 349, 355, 286 N.W.2d 831 (1980). Any reasonable doubt as to the existence of such an issue must be resolved against the moving party (the City). *Kraemer Bros., Inc. v. United States Fire Ins. Co.,* 89 Wis. 2d 555, 566, 278 N.W.2d 857 (1979). We have stated, "[i]f the trial court has determined the movant has proved to the court's satisfaction that there is no genuine issue of material fact as a matter of law, then the trial court should enter judgment." *Heck,* 93 Wis. 2d at 356 (citing *Wright v. Hasley,* 86 Wis. 2d 572, 578–79, 273 N.W.2d 319 (1979)). Additionally, even if there are no disputed material facts, summary judgment is not appropriate if reasonable alternative inferences

may be drawn from these facts: in such a situation, a trial is proper. *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). When the court reviews a party's motion for summary judgment, "[i]f the material presented on the motion is subject to conflicting interpretations or reasonable people might differ as to its significance, it would be improper to grant summary judgment." *Grams,* 97 Wis. 2d at 339. Since we are called upon to review an order for summary judgment, we will apply the summary judgment standards set forth in sec. 802.08, Stats.,[9] in the same manner as the circuit court. *Wright,* 86 Wis. 2d at 579.

The parents contend that summary judgment was improper in this case because genuine issues of material fact exist concerning the conduct of the City and its lifeguards. The parents first argue that the active negligence of the City and its lifeguards was outside of the statute, and so there is a triable issue for the jury. Since we hold, as a matter of law, that the City cannot be liable for active negligence under sec. 895.52, Stats., the fact that the City and its lifeguards may have been negligent is irrelevant to a determination of liability under the recreational use statute.

The parents argue secondly that the question of whether the City's conduct was malicious and thus not immune under sec. 895.52(4)(b), Stats., represented a genuine issue of material fact. Section 895.52(4) provides two exclusions under which a governmental landowner

---

[9]Section 802.08(2), Stats., provides, in part:

The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

such as the City may be liable for injuries. The City did not charge an admission fee so we do not need to address subsection (a). The only possible exception under which the City may be liable is subsection (b); if the City or its employees caused the injury by a malicious act or by a malicious failure to warn of an unsafe condition that the City or its lifeguards were aware of.

On summary judgment, the court does not decide issues of fact, it decides whether there is a genuine (or disputed) issue of fact. *See Grams,* 97 Wis. 2d at 338. While there may be disputed facts in this case (e.g., whether or not the lifeguard assigned to the second station was using the bathroom when he was supposed to be at his station), there are no disputed issues of *material* fact. Material facts are those facts which are material to the controlling legal issue. *Huckstorf v. Vince L. Schneider Enters.,* 41 Wis. 2d 45, 49, 163 N.W.2d 190 (1968). The controlling legal issue here is whether the City's conduct was malicious. The parents primarily contend that maintaining a public beach with a hazardous drop-off without any warning of it is malicious. The City does not dispute that it maintained a hazardous condition without warning. The City does not disagree with the parents' recital of the fundamental facts in this case. It does not argue that its conduct and that of its lifeguards was not negligent. Rather, it argues that its conduct and its lifeguards' conduct was not malicious.

Summary judgment is appropriate in this case on the issue of maliciousness because the material facts in this case are undisputed, and only one reasonable inference can be drawn from these facts. *See Grams,* 97 Wis. 2d at 338. The City and the parents do not dispute what the City's conduct was in this case, but rather what are the legal implications of that conduct. The City provided

480

statements that neither the City nor its lifeguards had any ill-will towards the victims.[10] The parents do not contest this evidence, but rather argue that the facts themselves demonstrate a malicious intent, even without the element of ill-will or hatred. The parents argue that maintaining and failing to warn of a trap (the drop-off) was malicious conduct. The disputed issue involves the definition of "malicious," and whether or not the City's conduct rises to that level, based upon the facts of the case.

## III.

While we find the legislative statement of immunity for the city in sec. 895.52(2), Stats., to be unambiguous, the task remains for this court to define "malicious" as it is used in sec. 895.52(4)(b). It is important to note that the exception in sec. 895.52(4)(b), Stats., only applies to malicious conduct, although the predecessor statute, sec. 29.68, Stats., referred to "willful or malicious" conduct. Most states have a recreational use statute. Annotation, *Effect of Statute Limiting Landowner's Liability for Personal Injury to Recreational User,* 47 ALR4th 262 (1986). Wisconsin is different from other states, however, whose recreational use statutes include exceptions for "wilful, wanton and reckless conduct,"[11] "gross negligence or wilful and wanton misconduct,"[12] or "willful or malicious"[13] conduct. Although the City's conduct may

---

[10]The City submitted affidavits from each lifeguard and four city officials, each of which contained the statement: "I do not now, nor did I ever bear ill will, desire for revenge or hatred or intend insult or injury toward Brian O. Wells or Clarence Ervin III, or any member of either of their respective families."

[11]Or. Rev. Stat. sec. 105.675(1) (1989).

[12]Mich. Comp. Laws Ann. sec. 300.201. Sec. 1. (West 1984).

[13]Ga. Code Ann. sec. 51-3-25(1) (1982).

have been reckless, grossly negligent or willful, it is immune from liability unless it was "malicious." It is not enough for the parents to show that the City was aware of the drop-off and did not warn swimmers. The parents must establish that this conduct was malicious, not just that it was a reckless disregard for the safety of the users of the beach.

We discussed the distinction between malicious conduct and other types of conduct (in the context of punitive damages) in *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 294 N.W.2d 437 (1980). We stated,

> [t]his court has not required proof of an intentional desire to injure, vex or annoy, or proof of malice, in order to sustain an award of punitive damages. "[M]alice or vindictiveness are not the *sine qua non* of punitive damages." *Kink v. Combs,* 28 Wis. 2d 65, 79, 135 N.W.2d 789 (1965). It is sufficient if the injured party shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer.

*Wangen,* 97 Wis. 2d at 267. When defining malice for purposes of awarding punitive damages, therefore, this court has distinguished malice from reckless indifference or disregard.

The definition of "malicious," as used in awarding punitive damages is an appropriate definition to use in defining "malicious" as it is used in sec. 895.52(4)(b), Stats. Punitive damages are awarded if the defendant has acted outrageously. The purposes of punitive damages are to punish past outrageous conduct and to deter similar conduct in the future. *Fahrenberg v. Tengel,* 96 Wis. 2d 211, 222, 291 N.W.2d 516 (1980). Malicious conduct is but one type of "outrageous" conduct for which punitive damages may be awarded. However,

482

because conduct exempted from immunity by sec. 895.52(4)(b) should also be punished and deterred, a similar definition of "malicious" as it is used in that statute is appropriate.

■

Wisconsin JI—Civil 1707 (1990) PUNITIVE DAMAGES: NONPRODUCTS LIABILITY discusses malicious acts. It provides: "[a] person's conduct is outrageous if he acts either maliciously or in wanton, willful, or reckless disregard of the plaintiff's rights." Again, "malicious" is used as an alternative type of conduct to wanton, willful, or reckless disregard of the plaintiff's rights. We cited this jury instruction approvingly in *Jeffers v. Nysse,* 98 Wis. 2d 543, 297 N.W.2d 495 (1980), when we stated, "[t]hese instructions correctly state the law of punitive damages in Wisconsin on the facts of this case.". *Jeffers,* 98 Wis. 2d at 547. The jury instruction further provides, "[a]cts are malicious when they are the result of hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended." Wis. JI—Civil 1707 (1990).[14] As the appeals court did in *Wilson v. Waukesha County,* we adopt the jury instruction definition of "malicious" for purposes of sec. 895.52(4)(b), Stats. *See Wilson v. Waukesha County,* 157 Wis. 2d 790, 797, 460 N.W.2d 830 (Ct. App. 1990).

■

This definition is consistent with the dictionary definition of "malicious." It is a well-recognized rule of

---

[14]In contrast, the jury instruction defines "wanton, willful, and in reckless disregard" as conduct which "demonstrates an indifference on [the individual's] part to the consequences of his actions, *even though he may not intend insult or injury.*" Wis. JI—Civil 1707 (1990) (emphasis added). *See also Moua v. Northern States Power Co.,* 157 Wis. 2d 177, 189, 458 N.W.2d 836 (Ct. App. 1990).

statutory construction that nontechnical words and phrases are to be construed according to their common and ordinary usage. *State ex rel. B'nai B'rith Found. v. Walworth County,* 59 Wis. 2d 296, 307, 208 N.W.2d 113 (1973); *see also Moua,* 157 Wis. 2d at 189. The ordinary and common meaning of a word may be established by definition of a recognized dictionary. *Edelman v. State,* 62 Wis. 2d 613, 620, 215 N.W.2d 386 (1974). The definition of "malicious" in Wis. JI—Civil 1707 (1990) is consistent with the dictionary definition of "malicious." Black's *Law Dictionary* defines "malicious" as "[c]haracterized by, or involving, malice; having or done with, wicked, evil or mischievous intentions or motives; wrongful and done intentionally without just cause or excuse or as a result of ill will." Black's Law Dictionary 958 (6th ed. 1990). While we recognize that the last portion of this definition ("wrongful and done intentionally without just cause or excuse or as a result of ill will") permits an alternate interpretation, the primary part of the definition ("[c]haracterized by, or involving, malice; having or done with, wicked, evil or mischievous intention or motives") is harmonious with the jury instruction definition which we and the court of appeals have repeatedly endorsed. *See Jeffers,* 98 Wis. 2d at 547; *Moua,* 157 Wis. 2d at 189; *Wilson,* 157 Wis. 2d at 797. Clearly, malicious conduct is conduct which goes beyond willful conduct or reckless disregard for the youths' safety.

We conclude that the conduct of the City in negligently hiring and failing to train the lifeguards, the conduct of the lifeguards in negligently giving rescue attempts, and the conduct of both the City and the lifeguards in maintaining and failing to warn of the unsafe drop-off did not rise to the level of "malicious" in this

case. Although this conduct may have been negligent or in reckless disregard of the youths' safety, there is no evidence that the deaths were the result of hatred, ill-will, a desire for revenge or inflicted under circumstances where insult or injury was intended. Under the facts presented in this case, the City must prevail as a matter of law on the issue of maliciousness because no reasonable view of the undisputed facts will support a finding of malicious conduct. We agree with the *Moua* court's statement that "[i]f an exception to immunity is desirable under circumstances where less than intent to injure is sufficient, it is up to the legislature and not this court to make this change." *Moua,* 157 Wis. 2d at 190. The City is not liable to the parents under the malicious conduct exception of sec. 895.52(4)(b), Stats.

*By the Court.*—The judgment and order of the circuit court of Kenosha county are affirmed.

WILLIAM A. BABLITCH, J., (dissenting). By placing unqualified lifeguards on a public beach, the City of Kenosha (City) created a trap for the unwary. The presence of the lifeguards created the perception of a safe condition that was not justified. I do not agree with the majority that the recreational use statute exempts owners of recreational property from liability when the actions of the owner create a perception of safety that does not in reality exist. The legislature could not have intended such an absurd result.

The City placed a lifeguard on a public beach who had no training or experience. She had no training in first aid, CPR, or life-saving. She had not even been tested for her ability to swim. The majority concludes that as a matter of law the City's conduct was exempt from liability. The majority errs.

Section 895.52(4)(b), Stats., provides that an owner of recreational property is not exempt from liability for malicious acts or malicious failures to warn against an unsafe condition. I conclude that the term "malicious," as used in this statute, includes acts which are made with reckless disregard for the safety of others. This definition would maintain the policy behind the recreational use statute while still protecting the public from traps such as these. The City created a trap for unwary swimmers and for parents who justifiably assumed that the lifeguards were trained. The City's actions were undeniably deceptive, and, arguably, made with reckless disregard for the safety of others. A jury should be allowed to determine that issue. Accordingly, I dissent.

The facts in this case deserve further discussion. The deposition of the female lifeguard, who was nearest to the boys and observed them fall off the dropoff, demonstrates how poorly equipped she was to deal with this emergency. She had never worked at a pool or beach in any capacity before being hired by the City. She was hired after responding to a newspaper ad and was never tested for her ability to swim or save lives. She had never been trained in CPR. Her only relevant experience was a three credit swim class at the University of Wisconsin. The City of Kenosha provided her with a sheet that indicated the rules of the beach, but gave her no oral or written instructions as to how to protect the lives of swimmers in an emergency.

In addition, the affidavit of the plaintiff's investigator, Thomas Weiss, states that he had heard the head lifeguard explain that the female lifeguard had a phobia that fish or other living organisms would be following her in the water and that she did not like to be in any kind of water where she could not see where she was going or see the bottom of the water.

486

One of the other two lifeguards manning the beach at the time this incident occurred also had no lifesaving experience. Like the female lifeguard, he had been hired without a formal interview and without any skills testing. He was not trained in CPR. Furthermore, the City did not provide him with any oral or written instructions as to how to protect the lives of swimmers in an emergency.

The City hired the female lifeguard without any basis for believing that she was qualified as a lifeguard. She was not qualified. When Clarence Ervin and Brian Wells waded towards the dropoff, she acted as an unqualified lifeguard would—by doing nothing. She saw the boys go under the water and still did not act immediately. The deposition of a witness, Mirtha Dulzaides, states that this lifeguard watched the boys going up and down in the water for a period of time before Dulzaides and two other bystanders finally went into the water to attempt to save the boys. Dulzaides estimated that the female lifeguard did not enter the water until the boys had been under water for two minutes.

By placing unqualified lifeguards on a public beach, the city created a trap for the unwary. The presence of the lifeguards created the perception of a safe condition that was not justified. In addition, the lifeguards' presence may well have inhibited other swimmers from immediately responding to the emergency because they too expected the lifeguards to have been trained and knowledgeable in lifesaving procedure. In essence, the lifeguards were decoys that lured unwary swimmers and their parents into a false sense of security. Providing an unqualified lifeguard was as dangerous as providing boaters with a life jacket that does not float or installing smoke alarms that do not work.

487

I disagree with the majority's conclusion that in order to prove that the City's conduct was "malicious" the plaintiffs must be able to show that the acts of the City "were the result of hatred, ill-will, a desire for revenge or inflicted under circumstances where insult or injury was intended." Majority op. at 485.

Neither this court nor the legislature has previously defined malicious within the context of the recreational use statute. "Malicious," and its counterparts, "malice" and "maliciously" have been construed in numerous different ways depending on the context in which they are used. The term is used in many types of actions including those for libel, punitive damages, malicious prosecution, bankruptcy, malicious mischief, murder, and alienation of affection. A scan of Black's Law Dictionary (6th ed. 1990), West's Words and Phrases, and Am. Jur. 2d's sections on malice attests to the obscure nature of the term. In view of the difficult task of providing a concrete definition for the word, it is not surprising that Prosser and Keeton characterized the term "malicious" as an "unfortunate word." Prosser and Keeton, *The Law of Torts* 882 (5th ed. 1984).

The majority correctly notes that in punitive damages actions "malicious" conduct is often characterized by hatred, ill will, a desire for revenge, or an intentional infliction of insult or injury. *See* Wis. JI—Civil 1707 (1990). In other contexts, however, "malice" has been defined more broadly and the term may include actions made with "reckless disregard" for the rights of others. In *Manz v. Klippel*, 158 Wis. 557, 562 (1914), this court stated that malice in malicious prosecution cases could be established by "showing that the wrongful act complained of was done wantonly or recklessly . . .." In *Meyer v. Ewald*, 66 Wis. 2d 168, 175, 224 N.W.2d 419 (1974), we stated that for plaintiffs to prove "malice" as

that term is applied in malicious prosecution cases, it must be shown that:

> 'the defendants acted with a wanton or willful disregard for the facts or law in any manner whatsoever that would evince any ill will or vindictiveness toward the plaintiff or in any manner from which ill will or vindictiveness could be inferred.' (quoting *Yolk v. Seefeldt,* 35 Wis. 2d 271, 276, 151 N.W.2d 4 (1967)).

Black's Law Dictionary 956 (6th ed. 1990) provides many definitions of "malice," including that it is "[a] condition of the mind showing a heart regardless of social duty and fatally bent on mischief." Black's also states that "[m]alice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of the citizen." *Id.* at 956–57. "Maliciously" is defined as "[i]mports a wish to vex, annoy, or injure another, or an intent to do a wrongful act, and may consist in direct intention to injure, or in reckless disregard of another's rights." *Id.* at 958. One of the stated definitions of "malicious" is "wrongful and done intentionally without just cause or excuse or as a result of ill will." *Id.* at 958. *See also Tinker v. Colwell,* 193 U.S. 473, 485–86 (1904) (quoting *Bromage v. Prosser,* 4 Barn. & Cres. 247) (" 'Malice, in common acceptation, means ill will against a person, but in its legal sense it means a wrongful act, done intentionally, without just cause or excuse . . . .. It equally works an injury, whether . . . meant to produce an injury or not.' ")

Many other courts have also defined malice, etc. in ways that would raise a jury question in this case. " 'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v.*

*Laudani,* 783 F.2d 610, 615 (6th Cir. 1986). "[T]rial court's finding of 'reckless, willful and wanton conduct' was a finding of 'willful and malicious' conduct on the part of the defendant." *Breeds v. McKinney,* 171 Ohio St. 336, 170 N.E.2d 850, 853 (1960). "Malice, however, may consist of a state of mind determined to perform an act with reckless or wanton disregard of or indifference to the rights of others." *United States v. Vollweiler,* 229 F. Supp. 558, 561 (N.D. Cal. 1964). "[M]alicious connotes something more than mere negligence. It has been variously defined as: the intentional commission of a tortious act; the willful and reckless disregard of another's rights; and the wanton and deliberate commission of a wrongful act." *Tcherepnin v. Franz,* 393 F. Supp. 1197, 1208–09 (N.D. Ill. 1975).

In the context of a conditional privilege of immunity granted to public officials in the performance of their duty except when their conduct is "malicious," the First Circuit has stated that, "malice in this sense means something broader than personal ill will; it means an 'abuse' of the privilege. (cite omitted) . . .. Or . . . [that] the privilege is lost upon proof of . . . 'reckless indifference to the rights of the individual citizen.' " (cite omitted). *Kelley v. Dunne,* 344 F.2d 129, 133 (1st Cir. 1965). In this same context it has been said that, "malice which would remove the protection of privilege is not limited to hate, vindictiveness or animosity but may be found in reckless disregard of the right of another or such conscious indifference to results as could be regarded as willfully wrong." *Scholtes v. Signal Delivery Service, Inc.,* 548 F. Supp. 487, 497 (W.D. Ark. 1982).

The above discussion clearly illustrates the ambiguities of the term "malicious." If the language of a statute is ambiguous, we examine the scope, history, context, subject matter, and object of the statute to discern legis-

lative intent. *State v. Pham,* 137 Wis. 2d 31, 34, 403 N.W.2d 35 (1987). Furthermore, we must interpret a statute in such a way as to avoid an absurd or unreasonable result. *Id.*

The language of the recreational use statute's predecessor statute, sec. 29.68, Stats., indicates that "malicious" as defined in the recreational use statute should be construed as including conduct that is not necessarily "wilful" conduct. Section 29.68(3)(a) immunized owners from liability except when there was a "wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." If, as the majority asserts, "malicious" requires ill-will, vindictiveness, hatred, or the intentional infliction of injury, then the term "malicious" in the predecessor statute was entirely superfluous because each meaning of "malicious" was encompassed under the exception for "wilful" conduct. The established rule of this court, however, is that we avoid a construction of a statute which makes a word in a statute superfluous. *See, e.g., Wis. Elec. Power Co. v. Public Service Comm.,* 110 Wis. 2d 530, 534, 329 N.W.2d 178 (1983). There is no reason to believe that "malicious" is now defined any differently within the recreational use statute than it was before the legislature excluded "wilful" from the scope of the exception. Therefore, "malicious," as used in the recreational use statute, should be read to encompass conduct in addition to wilful conduct, such as conduct in reckless disregard for the rights of others.

Defining "malicious" to include acts done with reckless disregard for the safety of others would do no harm to the purpose of the recreational use statute. As the majority emphasizes, the legislature's purpose in creating the recreational use statute was "to limit the liability of property owners toward others who use their property

for recreational activities . . .." 1983 Wis. Act 418, sec. 1. Under any definition of malicious the statute provides extraordinary protection to the owners of recreational property. In exchange for the recreational use of their property, the legislature has granted owners immunity from liability for even serious acts of negligence. The City has virtually no obligation under the statute to ensure the public's safety. No public policy, however, supports allowing owners to actively deceive the public. It is unreasonable to believe the legislature intended to grant owners a license to misrepresent the safety of their property or facilities to the public by engaging in conduct that is the equivalent of setting a trap.

The term "malicious," as used in the recreational use statute, should be defined by this court to include conduct done in reckless disregard of the public's safety. It should also encompass conduct which suggests ill-will or from which ill-will could be inferred, without regard to the defendant's actual state of mind. Both of these definitions of "malicious" are consistent with the purpose of the statute. By giving the term "malicious" this broader definition we would also protect the public's safety from unjustifiable activity of recreational property owners and their employees.

The City of Kenosha and the amicus curiae supporting the City's position argue that to allow the potential for liability when lifeguards are gratuitously provided as a "safety measure" would deter owners from providing safety measures or additional facilities for recreational property users. "Safety measures," such as the lifeguards provided at Pennoyer Beach, which so egregiously betray the expectations of the public, are about as welcome as a Trojan horse. Thanks, but no thanks. If an owner of recreational property cannot provide lifeguards that are trained in lifesaving, then such "safety measure" should

not be provided at all. To lull parents into believing that their children are protected by trained lifeguards is worse than not providing lifeguards at all. If there were no lifeguards present, then people using the beach, including parents who allow their children to use the beach, would at least be alert to the actual condition of the beach: it was a beach without lifeguards.

I conclude that the actions of the City of Kenosha could well be "malicious" and present a question that should be decided by the jury. I dissent.